[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff brings this action seeking, under Count 1, return of double his security deposit and other reimbursements as set forth in Exhibit A to the complaint, and under Count 2, punitive damages and attorney's fees for violations under the Connecticut Unfair Trade Practices Act. Exhibit A requests reimbursement from the landlord for two month's security deposit, one month's rent, laundry bills in the amount of $206.91, and additional unspecified laundry bills incurred between August 21, 1991 and August 28, 1991. The defendant answered and filed a counterclaim claiming that the plaintiff breached the lease and caused damages to the premises which are chargeable to and in excess of the plaintiff's security deposit.
The plaintiff testified that he and his family were moving from St. Louis, Missouri, and he came out to find a house to rent in the Greater New Haven or Fairfield County areas. He said he told the defendant's broker he wanted a three or four bedroom CT Page 6738 home with a washer and dryer for 2 adults and 5 children, ages 4 through 16, at the time. He viewed the premises, which were occupied by tenants at the time, with his broker and the defendant's broker around June 10, 1991 and June 12, 1991. He provided a credit statement to the defendant's broker, who found him eligible to lease the premises. He then had a telephone conversation with the defendant in the next few days. The plaintiff testified that the defendant wanted to "size him up".
After that conversation, the defendant stopped at the plaintiff's place of business to pick up the first payment of $2500.00. He agreed to rent the property at 208 Derby Avenue, Orange, Connecticut, with a $2400.00 security deposit, for $1200.00 per month from the defendant. He testified that he and his family had intended to stay one year there. On June 23, 1991, he made the first payment of $2500.00 toward the sum, required by the defendant, of the security deposit of $2400.00 and the first and last month's rent of $2400.00. On June 27, 1991, he and his family moved into the premises. Almost immediately, problems occurred at the premises: water pressure was low; at times there was no water at all; lack of water affected the toilet facilities, cooking, bathing and laundry. Within 2 or 3 days of moving in, the plaintiff talked to the defendant about the water problems and asked the defendant what he planned to do. The plaintiff couldn't take showers every day because of lack of water. The plaintiff and his family had to purchase bottled water. He testified the defendant was contacted daily and he gave him suggestions to correct it.
Within the first two weeks of moving in, the defendant gave the plaintiff's wife the written lease for a term from June 25, 1991, through June 25, 1992. The defendant's signature was not affixed to the lease. The plaintiff and his wife signed the lease in the early part of July with some added handwriting and marks but, in specific, with the notation, as follows: "In the event that the well servicing of this property is inadequate to supply the water needs of Tenant in the Tenant's full discretion, Tenant may terminate Lease and receive a full refund of any unused rent and/or security deposit." He also placed an asterisk "*" near language setting forth 47a-13 on page 3 of the lease. He testified he placed the "*" there because they wanted the water corrected. Section 47a-13 recites the tenant's remedies when the landlord fails to provide essential services. He testified he was reluctant to sign the lease because of the water problems but the defendant promised to remedy the situation. CT Page 6739 After he signed the lease, he thought the lease was valid. The plaintiff and his family had to do laundry off premises. He testified that the defendant promised to pay those laundry bills until the matter was resolved. He complained to the defendant about the inability to do any laundry at all on the premises. He told the defendant that they had "no water" and expected some. He also said his children wanted to bathe, too. He said they would fight about who would get to bathe first and on what days. The defendant said he was doing all he could but when it rains the well will fill up and you'll get water. The defendant also told the plaintiff to have his children bathe together or on alternate days.
On July 10, 1991, the plaintiff made a $2,280.07 payment. That payment was to be added to the initial $2500.00 deposit to cover the initial $4800.00 payment for the first and last month's rent plus the security deposit, minus the $19.93 laundry bills. That total covered the month's rent for the June 25 through July 25, 1991 period. Around July 14, 1991, the defendant connected a hose to the adjacent neighbor's house at 214 Derby Avenue, Orange, to bring water to the plaintiff's house. The hose was connected for approximately two-three weeks. It supplied approximately 50% of their water needs. Then, on July 22, 1991, the plaintiff paid the defendant $1200.00 to cover the July 25 through August 25, 1991 period. The defendant told the plaintiff that when it rained the problem would be solved. There was a hurricane in August of 1991 with lots of rain. The plaintiff testified that since there was no increase in the availability of the water after that downpour, they decided to move. The plaintiff testified that the defendant told them that when they moved he would return the plaintiff's monies.
On August 21, 1991, the plaintiff sent the defendant a letter notifying him of their intention to vacate the premises on August 28, 1991, due to the water quantity and quality over the past two months and because they had not received a copy of the subject lease signed by the defendant. That letter also requested the return of their security deposit ($2400.00), one month's rent ($1200.00), and laundry bills reimbursement ($206.95), to their new address in Milford, Connecticut. That letter also noted that laundry bills incurred between August 21, 1991 and August 28, 1991 will be sent later for payment. The plaintiff and his family left the premises on August 27, 1991. He did not receive any response from the defendant to the August 21, 1991, letter, although they did receive the return receipt CT Page 6740 green card with a date of delivery to the defendant on August 23, 1991. The laundry bills for August 21 through August 28, 1991 were sent via regular mail by the plaintiff's wife at a later date to the defendant.
The plaintiff testified that he and his family left the premises in excellent condition. They contacted all the utilities to pay their final bills. He testified they did pay all the utilities during the tenancy. They had put tarps down to protect the new carpet. The plaintiff testified that the defendant told him not to worry about the lawn during the initial conversation they had after June 10, 1991. They left the keys on the counter. The plaintiff testified that all the walls were clean when they left. They cleaned all the appliances and left no food stuffs. The plaintiff testified that the family incurred unexpected moving expenses in the amount of $1995.25 as a direct result of the lack of water. He testified that someone moved in about a week after they left.
Mrs. Janice Birney, wife of the plaintiff, testified about how her life was planned around doing the laundry and organizing the children's showering schedules. It was summertime and all the children wanted to shower and it couldn't always happen. The children complained about the water every day. She testified that she had to manually add water during the rinse cycle when she tried to do laundry because the water pressure was too low. She was also concerned that too little water would damage the washing machine. Her youngest child was 4 years old so she had to make special arrangements to go out and do the laundry about every other day. She testified that the family purchased bottled water at $.89 per gallon and used about seven gallons of water per week for cooking and drinking. She turned to using paper plates because she had to plan ahead for water. She said the water out of the faucet was brown for about two or three days after the hurricane in August. On those days the family went to the beach to bathe.
She said she told the defendant she didn't feel comfortable signing the lease until the water situation cleared up. She said the defendant told her that she needed to sign the lease and that he wouldn't let them not sign the lease. She said they signed the lease because of the defendant's insistence. She mailed the "marked up" lease with a return receipt and it was delivered July 11, 1991. Around July 11 or July 14, 1991, the hose was connected to their house from the neighbor's house. In mid-August, CT Page 6741 she noticed low pressure and found out the hose was disconnected because the landlord of the neighbor's house wanted the hose disconnected.
She vacuumed, washed the floors and cleaned before they left on August 27, 1991. She testified that she made a $900.00 deposit for moving expenses. She testified that she called the defendant on the telephone around August 20, 1991, to tell him they were leaving. She asked if they could get their security deposit back before they left. He said "no" but he said "Don't worry about getting your money back; when the 18-wheeler comes to take you out of there I'll be there with money."
She said they didn't have any pets. She testified to fifteen laundry receipts of $297.06. She testified that she brought in approximately 20 and 30 pounds of laundry every other day for her seven member family for washing at the laundramat. She said with beach towels the pounds would sometimes be more than 30 pounds. She said even with the hose connected there was not enough water pressure for doing laundry. She said that defendant said he would reimburse them for their laundry bills.
The defendant testified that he found the plaintiff eligible to lease the premises. He said Mrs. Birney called him first on a Monday complaining about the windows being stuck by being painted over and the lack of cabinet space. He told her he would fix the windows and he did and how she could rectify the cabinet space problem. She did not mention the water problem during this call. He said they moved in on a Friday or Saturday and Mrs. Birney called on a Tuesday complaining about the water. The defendant testified that to address Mrs. Birney's complaint he first hooked up a 5/8" or 3/4" hose for approximately 50 feet from the neighbor's house to 208 Derby Avenue to have the water running continuously in the plaintiff's house. He assumed the well had run dry. He said he did not offer them another place to live. He told her he would pay for her laundry bills that day because he figured she must have had lots of laundry that day after moving in and had emptied the well, but he said he never intended to pay for these bills all summer. He said he did not advertise the house for rent but was actively looking for a tenant by word of mouth. He said he is a licensed plumber and does not consider himself in the business as a landlord. He said he used someone in his family to help him rent it. He said he purchased the house in 1989 and had the water tested that year. There was a tenant there before the Birneys moved in. After she CT Page 6742 complained, he had tried to hook the house to the city water main about 200 feet from the house but a contractor said he could not "tie in" water because of interference by Route #34 that would need to be dug up, and the bonding that was necessary. He did not produce the contractor or the contractor's estimate at trial.
He testified that he received the signed lease from the plaintiff and noticed the handwritten changes but he did not sign the lease or return it to them. He objected primarily to the new language added by the plaintiff about "full discretion" of the tenants. Because of that language he refused to sign the lease. He only agreed to original lease terms and not the amendments. He was upset that they changed the lease and he told Mr. Birney that. He said the parties did not sit down and work out the differences. He just thought that "his" lease was controlling. He testified that the landlord of the next door neighbor told him that Mrs. Birney didn't want the hose connected. In mid-August, he disconnected it and went the next day with his uncle to inspect the well. He testified that he didn't ask Mrs. Birney herself if she wanted it disconnected. He thought Mrs. Birney just didn't want to stay. When he inspected his well, he said he found 130 feet of water for the well that was 5 feet in diameter. He did not know the quantity in gallons. He said he then went to the basement of the premises and he noticed that the valve that controlled the water pressure was down and once he raised it he heard the gushing of water and he went upstairs with Mrs. Birney to the second floor and saw the upstairs tub overflowing and he thought the problem was solved. Mrs. Birney testified that she never touched the valves. After that he testified that she still complained, but he just felt the plaintiff and his family were abusing the water and using the water as an excuse to leave.
He said no other tenants ever complained about water problems. He had to replace the keys because they didn't turn over the keys to him when they left. He submitted a $16.74 receipt for the keys and lock for the front and back doors. He introduced a letter received in the fall of 1991 from the next door neighbor, Mr. Hope Ross, for the U.I. bills from July 6 through August 6 to show that the neighbor's bill was $40.00 more to service the plaintiff's house. He submitted a paid carpet cleaning bill of September 25, 1991, for $425.00. He testified that the carpets were dirty. He testified that the carpets were not cleaned before the Birneys moved in. He also submitted a September 9, 1991, price quote to repair all nail holes in the walls where needed and repaint to cover crayon marks with 2 coats CT Page 6743 of Latex flat for $1435.00. The defendant did this work himself in September and did not have this contractor do it or pay him for this work. He said it took him 2-1/2 weeks to do the repair and painting, working around 6-7 hours per day for 6 days per week. He painted seven rooms. He did not offer any photographs of the damages.
He also paid his neighbor, Donald Hope Ross, on October 1, 1991, the $40.00 for costs related to connecting the hose and $53.30 to Cash Oil Company on October 9, 1991, for what he said was the plaintiff's use of fuel oil. He paid the U.I. Company bills he said were for 208 Derby Avenue, on July 29, 1991 for $101.58, October 25, 1991 for $12.78, and November 27, 1991 for $9.70, totalling $124.06. He also said that it took him almost all day to cut the grass on August 28 or 29, 1991, after they left, and that charge is $40.00. He said he is claiming rent for August, September, October and November, totalling $4800.00. He said he and his girlfriend prepared and mailed an accounting of the security deposit to the plaintiff. He said there was no water meter at the premises and had no idea how much water the plaintiffs used. He stated he did not send the plaintiff a bill for lawn cutting. He said he knew they were leaving August 28, 1991 and that the house was vacant between August 28 and August 30, 1991. On December 1, 1991, he said he again leased the premises.
DISCUSSION
The first issue presented by the defendant is whether or not there was a written lease agreed to by both parties. And, if there was not a written lease, then what was the status of the tenancy. In this case the defendant forwarded a lease to the plaintiff to sign after they had agreed on a monthly amount and security deposit, and the plaintiff had moved in on June 27, 1991. The plaintiff amended that lease and sent it back on July 11, 1991 to the defendant who did not sign it or return it to the plaintiff, and testified that he did not agree with the amendments. There was no evidence presented that the defendant ever informed the plaintiff that he did not agree with the amendments. Then, on August 21, 1991, because of the water problem and because the plaintiff did not receive a signed copy of the subject lease, the plaintiff notified the defendant of his intention to vacate the premises.
A discussion of the parties' legal rights properly starts CT Page 6744 with the truism that a lease is a contract. Welk v. Bidwell,136 Conn. 603, 606 (1950). It is a basic principle of contract law that in order to form a binding contract there must be an offer and acceptance based on a mutual understanding by the parties. Bridgeport Pipe Engineering Co. v. DeMatteo Construction Co.,159 Conn. 242, 249 (1970). Any qualification of or departure from the terms in which the offer was made by the offeror, however, invalidates the offer unless the offeror agrees to the qualification or departure. See Randolph Construction Co. v. Kings East Corporation, 165 Conn. 269, 276 (1973). The law does not make a contract when the parties intend none nor does it regard an arrangement as completed which the parties thereto regard as incomplete. New Haven Tile Floor Covering Co. v. Roman, 137 Conn. 462, 464 (1951).
The discussions between the parties before the plaintiff moved in never amounted to a finalized oral lease agreement. Those discussions contemplated a written lease agreement for one year. The proposed written lease agreement in which the tenant inserted language allowing the tenant in its full discretion to terminate the lease and receive a full refund due to an inadequate water supply, which clause was not agreed to by the landlord, supports a conclusion that the parties never reached a final written or oral agreement for a definite term for the tenancy.
The tenant, then from July 11, 1991, the date the signed lease was received by the landlord, held over with the landlord's acquiescence. An amount of monthly rent was agreed to by the parties, as was the security deposit, and was tendered by the tenant both before and after July 11, 1991, and accepted by the landlord. "Such conduct raises an oral contract of leasing by implication." Bushnell Plaza Development Corporation v. Fazzone,38 Conn. Sup. 683, 685 (1983), citing Welk v. Bidwell, 136 Conn. 603,608 (1950). Unless the rental agreement fixes a definite term, the tenancy is month-to-month. See Conn. Gen. Stat.47a-3b. See also Fischel v. Word Processing Associates of Fairfield County, SNBR #317 (1988).
With respect to the plaintiff's Count 1, the plaintiff sought return of his security deposit and double damages under the act. The evidence was essentially uncontroverted that the plaintiff paid the defendant a security deposit of $2400.00, representing two months' rent. See Paragraph 3 of the Defendant's Counterclaim. See Conn. Gen. Stat. 47a-21(b)(1), CT Page 6745 regarding a maximum of two months' rent for security deposits. There was some confusing testimony by the plaintiff and some testimony by the defendant that the $19.93 in laundry bills incurred by the plaintiff for lack of an adequate water supply would be used to reduce the tenant's required security deposit. However, that $19.93 payment was deducted in the July 10, 1991 check covering both one month's rent and the remainder of the security deposit. The defendant did not persuade the court that that laundry bill should be charged to the security deposit, as opposed to the first month's rental payment.
The security deposit act applies to all landlords, Conn. Gen. Stat. 47a-21(a)(6) and 47a-1(d). The person who is the landlord at the time that the tenant vacates is responsible for returning the deposit. Conn. Gen. Stat. 47a-21(e); Sutton v. Pinto, SNBR #342 (1990). The landlord must return the security deposit, plus interest, "within thirty days after the termination of a tenancy." Conn. Gen. Stat. 47a-21(d)(2). In the context of the security deposit act, this refers to the date the tenant vacates. To trigger the time limits, however, the tenant must give the landlord a written notice of his forwarding address. Kulenski v. Siclari, N.H. #539 (1990). In this case, the plaintiff sent a registered mail letter on August 21, 1991, and it was received by the landlord on August 23, 1991. That letter provided the plaintiff's forwarding address at 866 Boston Post Road, Milford, Connecticut. The landlord's duty is to return the security deposit, plus interest, or to account in writing for his claims against the deposit and to return any portion of the deposit, plus interest, against which he has no claim. Conn. Gen. Stat. 47a-21(d). If the landlord withholds any of the deposit, the act requires "a written statement itemizing the nature and amount" of the damages claimed as a result of the tenant's failure to comply with his obligations, C.G.S.47a-21(d)(2). The itemization must be specific, both as to the nature of the items of damage and as to their costs, Costales v. Gelinas, H-906 (1989). The refund or the accounting must be delivered to the tenant within 30 days after the tenant vacates. The refund must include statutorily-mandated interest on the deposit, Murphy v. Grigas, H-998 (1992). The plaintiff testified he never received a refund or an accounting. The defendant said his girlfriend mailed an accounting to the plaintiff. The defendant did not produce a copy of it or his girlfriend's testimony at trial. He did not specify the date it was prepared or mailed. The court, therefore, credits the testimony of the plaintiff and finds that the defendant violated Conn. Gen. Stat. CT Page 674647a-21(d), by failing to provide the refund or an accounting. Therefore, since the court has found that the landlord violated Conn. Gen. Stat. 47a-21(d), and since the double damages claim was pleaded, the doubling of the security deposit is mandatory. Kufferman v. Fairfield University, 5 Conn. App. 118 (1985). See City of New Haven v. Mason, 17 Conn. App. 92 (1988). Therefore, the plaintiff is entitled to $4800.00 in double damages.
With respect to the plaintiff's claim for one month's rent in Exhibit A, a review of the security deposit law provides that a landlord shall not demand a security deposit in an amount or value in excess of two months' periodic rent which may be in addition to the current month's rent. (See Conn. Gen. Stat.47a-21(b)(1). "Security deposit" is defined as any advance rental payment other than an advance payment for the first month's rent and a deposit for a key or any special equipment. Conn. Gen. Stat. 47a-21(a)(10).
Since the month's rent claimed in Exhibit A was made as an advance payment for the last month's rent, it represents an excessive security deposit in violation of 47a-21(b)(1). And, although the remedy for demanding security in excess of the statutory maximum is not set forth in the statutes, the proper relief in equity is to order the excess, together with interest, returned to the plaintiff. See Murphy v. Grigas, H #998 (1992), p. 12. In this case that amount is $1200.00, plus 5-1/4% interest, commencing July 10, 1991.
As to the additional relief claimed in count 1, as set forth in Exhibit A, based on the landlord's failure to supply the essential service of running water under Conn. Gen. Stat.47a-13, the court finds that the plaintiff has established that he and his wife (who was a signator on the contemplated written lease) gave oral notice on numerous occasions to the landlord regarding his breach in not providing adequate running water. The evidence was abundant that the water that was periodically supplied to the house from the well for the premises did not meet even the most minimum of levels needed by a family of seven. The defendant's effort to prove that the plaintiff left the premises for reasons other than those complained of was unavailing. The defendant's efforts to prove that the conditions complained of were beyond his control were also unavailing. The court, therefore, finds that the plaintiff was justified procurring additional services involving water for laundering their clothes during the period of the landlord's noncompliance, based on the CT Page 6747 sorely inadequate water supply. The court, therefore, finds that the laundry bills totalling $277.11 ($297.04, minus $19.93 already deducted in the July 10, 1991 payment), and the bottled water costs of $56.07 (9 weeks X $6.23), should be reimbursed as a deduction from rent for essential services as authorized by Conn. Gen. Stat. 47a-13(a)(1).
As to the plaintiff's other claim at trial for damages, including moving expenses, under count 1, such damages cannot be awarded in this case because they were not specifically pled in the plaintiff's amended complaint. The plaintiff did not specifically plead double actual damages under Conn. Gen. Stat.47-13(a)(3) and did not move to amend his complaint to conform to the evidence as trial with respect to these claims. See Practice Book 109A, 175 and 176. See City of New Haven, Mason,17 Conn. App. 92, 95-97 (1988).
Even a broad reading of this complaint does not give the defendant notice of the additional remedies raised at trial and in the plaintiff's post-trial brief. See Conn. Practice Book Ann. by Kaye and Effron, Vol. 3, Form 704.7, "Damages for failure of lessor to provide essential services." The plaintiff just cannot recover for a type of damages not set forth in the complaint. Sampiere v. Zaretsky, 26 Conn. App. 490, 492-495
(1992).
In count 2 of the complaint the plaintiff seeks punitive damages and an award of attorney's fees under the Connecticut Unfair Trade Practices Act (CUTPA). The plaintiff contends that the failure to return the security deposit and the failure to provide essential services constitutes a CUTPA violation.
Conn. Gen. Stat. 42-110b(a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."
"Person" is defined by Conn. Gen. Stat. 42-110a(3) as:
 [A] natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity.
"Trade" and "commerce" are defined by Conn. Gen. Stat. CT Page 674842-110a(4) as:
 [T]he advertising, the sale or rent, or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state. (emphasis added)
To be liable under CUTPA, the defendant must be engaged "in the conduct of any trade or commerce" when committing the unlawful acts. The appropriate focus is upon the status of the CUTPA defendant and whether his alleged actions took place in the conduct of any trade or commerce.
The Supreme Court has ruled that CUTPA applies to residential landlord-tenant transactions, and that a landlord's violation of the public policy of the landlord-tenant act, Conn. Gen. Stat. 47a-1, et seq., is a CUTPA violation. Conaway v. Prestia, 191 Conn. 484 (1983). See also Sullivan v. Bucci, N.H. #83, 9 CLT #8, p. 20 (Foti, 1982); Leeds v. Wethersfield Gardens, H #368 (1982), holding that the failure to supply utility services can be sufficient to state a cause of action under CUTPA.
In Collazo v. Dias, N.H. #555 (1991), the court held that a violation of the security deposit law violates public policy and therefore violates CUTPA. In that case, as in this one, the landlord was aware of the plaintiff's forwarding address and, despite that knowledge, he neither refunded the deposit nor provided a written itemization.
The plaintiffs have suffered an "ascertainable loss", the failure of the defendant to return their deposit and provide adequate running water. The court finds that the plaintiff is entitled to an award of attorney's fees under CUTPA. And, at the request of the defendant, the court requests that the clerk schedule a further hearing limited to the issue of the amount of attorney's fees to be awarded.
An award of punitive damages for a CUTPA violation is discretionary with the court. Conn. Gen. Stat. 42-110g(a). Such an award must be based on "a reckless indifference to the CT Page 6749 rights of others or an intentional and wanton violation of those rights." Gargano v. Henry, 203 Conn. 616, 622 (1987). The court finds that this standard has been satisfied by the facts of this case, in that the refusal to return the security deposit and to provide adequate water supplies clearly offends public policy. Accordingly, the court awards the plaintiff the sum of $2500.00 as punitive damages for the defendant's conduct with respect to the lack of provision of essential services.
The court declines, however, to make an additional award of punitive damages which would be in addition to the double damages awarded under 47a-21(d)(2). This court finds that the additional $2400.00 in double damages awarded under the security deposit statute services the same purpose of deterrence and punishment which would be achieved by an award of punitive damages under CUTPA for those acts. The court, in the exercise of its discretion, therefore will not award additional punitive damages under CUTPA in addition to double damages already awarded for the security deposit violations.
With regard to the CUTPA count, the defendant contends that CUTPA does not apply to the one-time rental of a single family residence by an individual not engaged in the business of renting property.
No Connecticut appellate level cases address the issues of the applicability of CUTPA to one-time residential real estate transactions, and the superior courts are split on the issue. See, e.g., Sikorsky v. Nelson, 2 CTLR 605 (October 22, 1990, Austin, J.); Skinner v. Till, 3 CTLR 627 (April 16, 1991, Teller, J.); McCarthy v. Fingelly, 4 CTLR 222 (July 1, 1991, Katz, J.); Oppici v. Arata, 4 CTLR 625 (September 23, 1991, Hadden, J.).
Based on the wording and definitions of CUTPA, as noted above, this court finds that CUTPA does apply to the real estate rental transaction at issue before this court. A reading of CUTPA and its legislative history reveals that it was not intended to apply to isolated transactions which do not occur in a business or professional context. Consumers who enter into transactions for personal, family or household purposes clearly should not have to defend against CUTPA claims brought by their creditors, banks, car dealers and landlords. Again, the primary purpose of CUTPA is to produce more equitable bargaining power in the marketplace. CT Page 6750
Conn. Gen. Stat. 42-110a(4) defines "trade" and "commerce" for purposes of the act as including "the sale or rent or lease, the offering for sale or rent or lease . . . of . . . any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value in this state." The legislature has thus defined trade or commerce to include the sale or rental of a single property or single commodity. That he did not advertise, except by word-of-mouth, is of no import.
The evidence in this court was that the defendant, although a plumber regularly, had leased to tenants at that residence both before and after the Birneys were tenants. There is no requirement under CUTPA that a person be in "the business of renting" such property or that the person be in the "ordinary course of business" in order to be "engaged" in trade or commerce within the meaning of the act. Further, it seems to this court, under the reasoning of Conaway v. Prestia, supra, that almost every residential landlord-tenant transaction which results in the formation of a rental agreement and triggers application of Conn. Gen. Stat. 47a-1, et al, takes place in a professional or business context. Additionally, Conn. Gen. Stat. 42-110c(a) establishes specific transactions which are exempt from CUTPA, and there is no exemption for transactions which do not occur in the ordinary course of the defendant's business.
Conn. Gen. Stat. 42-110g also confirms this interpretation by providing a cause of action for any person who has suffered an ascertainable loss of money or property as a result of "the use or employment of a method, act or practice. . . ." (Emphasis added). A single act is sufficient to give rise to CUTPA claim. Moreover, the court also notes the statutory requirement that the CUTPA provisions are remedial and should be so construed. Conn. Gen. Stat. 42-110b(d).
DEFENDANT'S COUNTERCLAIM
Conn. Gen. Stat. 47a-11 sets out the tenant's statutory duties, of which the most general is the duty to "not wilfully or negligently destroy, deface, damage, impair or remove any part of the premises or permit any other person to do so," Conn. Gen. Stat. 47a-11(f). Since tenant liability must be based on wilful or negligent conduct, the mere fact of damage does not necessarily make the tenant liable. Proof of property damage requires evidence. The landlord bears the burden of proof on all elements of a damage claim. This means that the landlord must prove that CT Page 6751 (a) the damage occurred, (b) it exceeded normal wear and tear, and (c) it was caused by the tenant, Kulenski v. Siclari, NH-539 (1990); Stutz v. Andren, SNBR-381 (1992); Lurie v. Baker, NH-499 (1990); Pilagin v. Michalski, H-603 (1985). Damage may be shown either by direct evidence or circumstantially. However, a tenant is not liable for damage that already existed when he moved into the apartment or for damage which occurred after he vacated, Wareck v. Connecticut Chair Car Co., NH-557, 6 CSCR 713 (1991); Slaughter v. McFarlane, NH-583 (1992).
The tenant is also not liable for what is usually described as "normal" or "reasonable" wear and tear, Dell'Oro v. Kelly, SNBR-384 (1992); Grzewinski v. George, H-930 (1989); Opinion of the Attorney General, 6 CLT #38, p. 19 (1980). The determination of what is wear and tear, as distinct from what is property damage, is heavily dependent on the facts of the particular case; but in general it refers to deterioration of or damage to the property which can be expected to occur from normal usage. For example, the tenant is not liable for wear to a landlord-provided carpet which reflects normal usage of a rug.
Wear and tear also includes normal repainting and cleaning which occur at the end of a tenancy. The tenant is not liable for nail or pin holes in a plaster wall which would ordinarily be spackled as part of a routine repainting, Bronzi v. Barone, H-533 (1984); Pilagin v. Michalski, H-603 (1985). Each claim must be evaluated on its own merits, in light of the general principle that some wear and tear is inevitable in rental property.
The landlord must also establish sufficient evidence of the amount of the damage to remove a judgment from the area of speculation. This will not ordinarily require expert testimony or appraisals, but it does require the presentation of some evidence from which a court can make a reasonable estimate of the amount to be awarded, Clarke v. Mele, SNBR-372 (1992); Collazo v. Dias, NH-555 (1991).
Property damage may be measured by repair cost or by value, as appropriate. Replacement cost is not usually allowed. Thus, if a tenant has destroyed or removed a landlord-provided carpet, the tenant's liability must be adjusted for the age and condition of the carpet, since the tenant is liable only for lost value, Nitch v. Lavoy-Alaimo, H-977 (1992); Bonito v. Lawrence, NH-576 (1992). CT Page 6752
The dollar value of damage may be shown by paid bills or estimates, DiNapoli v. Doudera, 28 Conn. App. 108, 609 A.2d 1061
(1992); Wyatt v. Ghosh, SNBR-366 (1992), but the courts have held that paid bills are more credible. If damage is repaired as part of a larger repair or improvement job, the tenant is liable only for the portion of the repair caused by his negligent or wilful conduct, and the landlord's evidence must provide a method by which the court can determine how much to allocate against the tenant, Sippin v. Ellam, SNBR-338 (1989); Strofolino v. Bordeau, NH-531 (1990). While courts should not impose an unreasonable burden of proof, judges handling property damage claims in landlord-tenant cases have traditionally sought to make sure that such claims are legitimate and that the amount claimed as damages is not inflated, Bonito v. Lawrence, NH-576 (1992).
Based on the evidence presented by the defendant and the credibility of the witnesses, the court finds for the defendant in the following amount, only for the replacement of the locks and keys, for $16.74.
On all the other damage claims, the defendant did not meet his burden of proof. Since the court has determined that an oral month-to-month tenancy was created, all claims by the landlord for unpaid rent after the plaintiff vacated must also fail, except for three days as $40.00 per day to cover August 26-28.
Accordingly, judgment for the plaintiff on the complaint as follows:
Count I
1. Double Security Deposit $ 4,800.00
2. (a) Return of Excess Security Deposit 1,200.00
 (b) Interest at 5.25% on above (2 years X $63.00) 126.00
3. (a) Laundry Bills 277.11
(b) Bottled Water 56.07
Count II CT Page 6753
1. Punitive Damages 2,500.00
2. Attorney's Fees To be decided
Total $ 8,959.18
plus attorney's fees and costs
Judgment for the defendant on the counterclaim in the amount of $136.74.
Clarine Nardi Riddle, Judge CT Page 6754